IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

KONSTANTIN GRIAZNOV,
*Plaintiff/Counterclaim Defendant*,

v.

Civil Action No. ELH-16-2522

J-K TECHNOLOGIES, LLC,
*Defendant/Counterclaim Plaintiff.*

**MEMORANDUM OPINION**

This case is rooted in a contract to bring a 2012 McLaren MP4-12C (the "Vehicle")[1] into compliance with government regulations regarding safety and emissions. The parties dispute, *inter alia*, whether money is due and owing under the contract.

Plaintiff Konstantin Griaznov is the owner of the Vehicle, valued in excess of $278,000. *See* ECF 1 ("Complaint"); ECF 34 ("Amended Complaint"), ¶¶ 1, 7. In July 2013, Griaznov imported the Vehicle into the United States, without knowledge that the Vehicle was ineligible for importation. *Id.* ¶¶ 13, 14. Pursuant to a "Compliance and Conversion Agreement" between plaintiff and defendant, J.K. Technologies, LLC ("J.K."),[2] J.K. agreed, *inter alia*, to provide compliance and automotive services for the purpose of satisfying required safety standards promulgated by the U.S. Department of Transportation ("DOT") and mandatory emissions standards promulgated by the U.S. Environmental Protection Agency ("EPA"). ECF 55-1 (the

---

[1] Plaintiff asserts in his Amended Complaint that the Vehicle is the 2012 model year. *See* ECF 34, ¶ 7. But, several of defendants' exhibits suggest that the McLaren is a 2011 Vehicle. *See, e.g.*, ECF 45-5 at 2-8; ECF 55-1 at 2. The model year of the Vehicle is not material to the issues.

[2] Plaintiff refers to defendant as "J-K Technologies, L.L.C." ECF 34. However, defendant refers to itself as J.K. Technologies, LLC. ECF 7. I shall use the defendant's terminology. And, the Clerk is directed to correct the caption.

"Agreement"). Plaintiff paid a deposit of about $20,500 to J.K. in October 2013 for the "conversion" of the Vehicle. ECF 45-1 at 9; ECF 45-2, ¶¶ 22, 51; ECF 55-1.[3]

Plaintiff asserts that on numerus occasions, he sought to cancel the Agreement, as permitted under its terms, and asked J.K. to export the Vehicle. ECF 4, ¶¶ 28, 30. But, J.K. refused to export the Vehicle. *Id.* ¶ 30. After J.K. completed much of the work, Griaznov terminated the Agreement and refused to pay J.K. for services rendered. Therefore, J.K. has retained possession of the Vehicle.

Accordingly, Griaznov filed suit against J.K. He asserts claims of replevin, trespass to chattels, trover and conversion, breach of contract, and violation of the Maryland Consumer Protection Act ("CPA"), Md. Code (2013 Repl. Vol., 2017 Supp.), §§ 13-101 *et seq.* of the Commercial Law Article ("C.L."), which bars "unfair or deceptive trade practices." C.L. § 13-301; *see* ECF 34. Additionally, claiming that J.K. wrongfully possesses the Vehicle, Griaznov asks the Court to declare that J.K. cannot retain the Vehicle under C.L. § 16-202(c)(1) (the Maryland "Garageman's Lien Statute"). According to plaintiff, C.L. § 16-202(c)(1) is preempted by the National Traffic and Motor Vehicle Safety Act of 1966, as amended by the Imported Vehicle Safety Compliance Act of 1988, 49 U.S.C. §§ 30101 *et seq.* (collectively, the "Safety Act"). Further, Griaznov seeks to enjoin J.K. from "using, altering, damaging, destroying, or selling the Vehicle," and he seeks an injunction requiring J.K. to "restore the Vehicle to its original condition . . . ." ECF 34 at 7-8.

---

[3] Plaintiff states he paid a deposit of $18,000. ECF 34, ¶ 104. In its Answer, J.K. admits receipt of an $18,000 deposit. ECF 7 at 3, ¶ 20. But, elsewhere, defendant asserts a deposit payment of $20,500. *See, e.g,* ECF 45-1 at 9; ECF 45-2, ¶¶ 22, 51. Presumably, the $20,500 also included payment of the "flat fee" of $2,500 to prepare the petition for eligibility. ECF 34, ¶ 10. In any event, the discrepancy is not material.

J.K. has filed a Counterclaim (ECF 7), alleging breach of contract, and seeking compensatory damages for research, labor, parts, and storage costs incurred by J.K. in connection with the conversion. *Id.* at 11-12, ¶¶ 13-24. According to J.K., on August 12, 2016, it completed the conversion of the Vehicle to meet DOT standards, and on August 30, 2016, it completed the conversion to meet EPA standards. *Id.* ¶¶ 20-21. It maintains that it is entitled to recover $177,412.82 on its counterclaim (ECF 45-1 at 4),[4] as well as attorneys' fees, interest, and costs, pursuant to ¶ 18 of the Agreement. ECF 7 at 12; *see also* ECF 55-1, ¶ 18.

J.K. has moved for summary judgment as to Griaznov's Amended Complaint and as to its Counterclaim (ECF 45), supported by a memorandum of law (ECF 45-1) (collectively, the "Motion") and several exhibits. *See* ECF 45-2 through ECF 45-5. Griaznov opposes the Motion.[5] *See* ECF 54 ("Opposition").[6] J.K. has replied. *See* ECF 55 ("Reply").

No hearing is necessary to resolve the Motion. *See* Local Rule 105.6. For the reasons that follow, I shall grant the Motion, in part.

## I. Factual and Procedural Background

Plaintiff is a citizen of Russia. ECF 34, ¶ 1. He resides in Florida. *Id.*

J.K. is a Registered Importer ("RI") with DOT's National Highway Traffic Safety Administration. ECF 45-2, ¶ 5. J.K. is also an Independent Commercial Importer ("ICI"), as

---

[4] In the Counterclaim, J.K. initially sought to recover $168,287.82. *See* ECF 34 at 11-12.

[5] Plaintiff did not address the merits of the Motion or submit any exhibits. Rather, he asserted that discovery has "yet to take place" and that discovery "will show that there remain many issues which should be determined in a trial." ECF 54 at 1. This contention, which is without merit, is addressed, *infra*.

[6] When Griaznov filed the Complaint and the Amended Complaint, he was represented by counsel. *See* ECF 1; ECF 34. However, by Order of August 18, 2017 (ECF 41), I allowed his counsel to withdraw, and Griaznov subsequently failed to retain new counsel. *See* Docket. Accordingly, his Opposition was filed without the assistance of counsel.

recognized by the EPA. *Id.* ¶ 6. J.K. has two members: Lois Joyeusaz and Jonathan Weisheit. *Id.* ¶¶ 2, 4. In an Affidavit of Weisheit (ECF 45-2), submitted with the Motion, he avers that J.K. "is not now and has never been an automotive repair facility." *Id.* ¶ 8. Rather, J.K. specializes in the conversion of foreign manufactured automobiles to comply with DOT and EPA standards, thereby allowing those vehicles to be imported into the United States. *Id.* ¶ 7.

Weisheit is the Lead Project Engineer at J.K. (*id.* ¶ 4) and he "was responsible for the conversion of the Vehicle." *Id.* ¶ 11. In that role, he personally worked on the Vehicle "to determine what modifications needed to be made to . . . make it eligible for importation into the United States." *Id.*; *see also id.* ¶ 4. His work "included, among other things, obtaining proper programming codes and working directly with DOT and EPA in order to modify the Vehicle's computer, emissions, and safety systems." *Id.* ¶ 11.

DOT maintains "a registry," also known as the "eligibility list for importation" (hereinafter, the "Eligibility List"), which contains the "make, model and year of a vehicle that is determined by DOT to be eligible for importation" into the United States. ECF 45-2, ¶ 21. If a vehicle is not on the Eligibility List, it may not be imported. *Id.* However, an RI can place a foreign manufactured vehicle on the Eligibility List by, *inter alia*, filing a "Petition for Import Eligibility," which DOT must then approve. *Id.* To file such a petition, the RI must "set forth specific alterations and/or modifications that," if made, "will bring the petition vehicle into compliance with DOT safety standards." *Id.*

According to Weisheit, in 2011 "Euro Tuning Hall, a fictitious entity," purchased the Vehicle from Gemballa Europe for 209,000.00 Euros. *See* ECF 45-1 at 4; ECF 45-2, ¶ 12.[7] On

---

[7] Weisheit asserts, ECF 45-2, ¶ 12: "There was apparently an issue with the bill of sale [for the Vehicle] so the amount paid for the Vehicle was changed from 209,000 to 200,000 Euros."

an unspecified date, the Vehicle was shipped to the United States "without Griaznov ever ascertaining" if it complied with DOT and EPA standards. ECF 45-2, ¶ 12. Because Euro Tuning Hall "was not in existence and did not have a VAT number or a Tax ID number," ownership of the Vehicle was "changed from Euro Tuning Hall to Konstantin Griaznov to enter the United States." *Id.*

In "early July 2013," Griaznov's agent, Eugene Karr, contacted J.K. ECF 45-2, ¶ 13. According to Weisheit, Karr stated that Griaznov "had purchased the Vehicle in Germany and that the Vehicle was stuck in U.S. Customs in Miami and would need to be shipped back to Germany unless he could find an RI or ICI that would agree to perform the necessary conversion work." *Id.* Karr also indicated that he and Griaznov had "already spoken to . . . DOT, EPA, the manufacturer of the Vehicle (McLaren), and Gemballa," and Karr and Griaznov were aware that the "Vehicle was not approved by DOT" and was "not on the import eligibility list." *Id.*

Karr stated that "McLaren was going to assist in the petition process." ECF 45-2, ¶ 13. According to Weisheit, "[t]his was important because if . . . McLaren could provide Mr. Karr with a manufacturer's letter with a listing of the parts required to convert the Vehicle for EPA and DOT, the petition process would only take a few months, J.K.'s . . . work would be reduced in scope, and the EPA testing would be waived." *Id.*

On July 9, 2013, J.K. provided Griaznov with a financial estimate for the conversion. ECF 45-2, ¶ 15; *see also* ECF 45-3 (J.K.'s undated quote to Griaznov) (hereinafter, the "Quote"). The Quote states, in relevant part, ECF 45-3 at 1-2 (bold in original; italics added):

> **Estimate:  $12,000.00-$18,000.00** *plus any safety systems parts that are not in* *compliance with USDOT Standards, provided the vehicle has a functioning* *emissions system* **. . .** *[and no]* *additional emissions systems parts and testing* *will be necessary*. **In addition USEPA requires a 1% Fee based on the**

**declared value of the vehicle. US Customs charges 2.5% duty, and US Customs and USDOT have bonds that cost approximately 1% that must be paid upon entry into the USA.**

. . . . [T]his estimate is only valid for two months. The estimate is designed to give you an idea of the cost of conversion depending on how the car is equipped and its condition upon arrival in our facility. *If the car is not equipped correctly or is in poor condition, there could be additional charges. There could also be additional charges if the car is not on the NHTSA eligibility list.* Their website is www.nhtsa.dot.gov/cars/rules/import and contains valuable information regarding import procedures and links to other Agencies.

\*　　\*　　\*

After the car arrives at our facility, we will do all of the necessary modifications to bring it into conformity with DOT and EPA regulations. This generally takes an average of 90-120 days. *If the car is not equipped correctly . . . , is in poor condition, AND/OR is not on the DOT eligibility list . . . , there could be additional charges and additional time for your car to be released from DOT and EPA.* These times range from several months to over a year if there is a fight with a manufacturer.

\*　　\*　　\*

*If the car is not emissions equipped, we replace all non-conforming parts with U.S. parts and there will be substantial extra charges* and additional time.

\*　　\*　　\*

We require a deposit of the base price plus agency fees with execution of the contract and the balance will be due upon receipt of parts for the vehicle or as billed to us by each supplier. This final payment must be in the form of a wire, ACH, or cashier's check . . . .

Also on July 9, 2013, J.K. informed Karr that certain documents were "required to obtain a Box 13 letter" from DOT. ECF 45-2, ¶ 14. According to Weisheit, a "Box 13 letter gives special permission for a vehicle that is not on the DOT eligibility list to enter the United States." *Id.* On July 11, 2013, J.K. requested a Box 13 letter for the Vehicle. *Id.*

J.K. and Griaznov executed the Agreement on or about July 12, 2013. ECF 45-2, ¶ 16; *see* ECF 55-1. In the Agreement (ECF 55-1), Griaznov is designated as the "Importer" and J.K.

is the RI.  *See* ECF 55-1 at 2.  According to plaintiff, the Agreement provided "an estimated base cost of $18,000.00 for the conversion" plus a flat fee of $2,500 for the petition for eligibility. ECF 34, ¶ 10.  Yet, plaintiff also asserts he had to pay a deposit of $18,000.  *Id.* ¶ 11.[8]

The Agreement states, in part, ECF 55-1 at 2-6 (bold in original; italics added):

### RECITALS

A. Importer wishes to import the following vehicle:
**2011 McLaren MP4-12C**
**VIN: SBM11AAB7CW000416 "The Vehicle"**

\*        \*        \*

D. The Importer is required to furnish to the Department of Transportation (DOT) a signed and executed agreement between Importer and Registered Importer (RI). This contract must commit the RI to conduct the conformance modifications required under the Federal Motor Vehicle Safety Act, and regulations adopted under it, and other safety related acts and regulations.

\*        \*        \*

F. The Importer understands that USEPA, US Customs, and USDOT require a US Customs bond and a DOT bond for the vehicle to clear US Customs and conditionally enter into the RI/ICI facility. . . .

G. The Importer wishes to contract with J.K. for conversion and compliance work on the vehicle specified above.

\*        \*        \*

2. . . . .  If there are any outstanding fees unpaid for US Customs or any other Agency at the time of importation that J.K. has to pay on the importer's behalf, interest will accrue at one point eight percent (1.8%) per month until the amount is reimbursed.  *In addition, storage of twenty five dollars ($25.00) per day will be charged until all unpaid balances are satisfied.*

3. J.K.'s work shall be deemed to be complete on the date DOT and USEPA hold periods have expired, provided the Agencies have not issued any request to delay the period.  Importer understands that *J.K. cannot make any guarantees regarding the time it takes to receive parts from a manufacturer, convert a vehicle, or obtain*

---

[8] The payment of a deposit of $18,000 suggests that plaintiff knew the cost would exceed $18,000.  Otherwise, he would have paid in full for work not yet performed.

*appropriate clearances from DOT and/or EPA. Further, the importer understands that the Agencies can, at any time, request further research, testing or other information, which could delay the importation process.* J.K. is in no way responsible for Agency response times, performance, or requests for additional information, which may cause delays. *This is especially true for vehicles that are not already on the eligibility list. For vehicles requiring a petition for a determination by the DOT that the vehicle is eligible for import, JK* [sic] *cannot guarantee the time frame for approval of a petition* or guarantee the DOT will approve the petition and grant an eligibility determination. If DOT rejects the petition, or the Importer decides it is too expensive to continue, and has the RI rescind the petition, the vehicle must be exported or destroyed.

4. . . . . Importer hereby waives any and all rights to possession of the vehicle until DOT and USEPA's hold periods have expired. Importer further understands that until this time period has elapsed, J.K. will only release the vehicle into the custody of U.S. Customs.

5. J.K. reserves the right to submit an invoice for its services to Importer every thirty (30) days during the term of this Agreement. *Invoices may be farther apart if parts are not received by J.K. and cannot be billed during this time frame. Should Importer fail to pay J.K. within ten (10) days after the date of J.K.'s invoice, J.K. reserves the right to charge storage fees for the vehicle of twenty-five dollars ($25.00) per day until any outstanding invoices are paid.*

*       *       *

7. **J.K. estimates that the cost for conversion of Importer's vehicle is $18,000.00** *PLUS any emissions system parts, safety system parts, labor, research and development, and any testing necessary to bring the vehicle into conformity with USEPA and DOT specification . . . . This estimate is our best guess without seeing the vehicle and may be updated . . . .*

8. *If the vehicle arrives at J.K. in poor condition, declared incorrectly,* **is not on the DOT eligibility list,** *or DOT Show or Display eligibility list, or does not have a functioning emissions system based on the Importer's representations,* **there may be extra charges. . . .** *The Importer understands that all estimates are based specifically on the representations of the owner. JK* [sic] *has not seen the vehicle or had the ability to inspect the vehicle prior to providing a quote. JK* [sic] *recommends checking with the manufacturer directly before making any assumptions regarding required components.*

9. Should this vehicle be subject to any Factory recalls for a period of ten (10) years, as required by the DOT or USEPA, the owner shall provide proof that the work required has been completed in a manner acceptable by the DOT and USEPA or shall authorize J.K. to perform the required work or authorize J.K. to

have such work performed by another company. The preceding work [is] to be completed at the owner's expense. . . .

10. Final payment must be made in cash, wire transfer, or cashier's check.

11. *Importer understands that if the vehicle is not picked up within ten (10) days of notice, storage fees will apply at twenty-five dollars ($25.00) per day from day of completion.* Importer understands that after thirty (30) days the vehicle will be forwarded to National Lien and Recovery for liquidation in order to pay the mechanics lien on the vehicle for work completed.

\*　　\*　　\*

14. *If the vehicle imported by Importer is not on the DOT Eligibility List, as published on the DOT's website and in the Federal Register, the Importer agrees to pay J.K. to place the vehicle on the Eligibility [List] as well as a daily storage fee of twenty five dollars ($25.00) per day, until the vehicle is placed on the Eligibility List.*

15. *Either party shall have the right to terminate this Agreement for any reason upon thirty (30) days of notice to the other party. If Importer terminates this Agreement prior to J.K.'s completion of its work, Importer agrees to pay J.K. a storage fee of twenty-five dollars ($25.00) per day until the vehicle is removed from J.K.'s custody and control, together with all other costs and expenses incurred by J.K.*

\*　　\*　　\*

17. Importer consents to jurisdiction and venue in the state and federal courts sitting in the State of Maryland.

18. If J.K. employs attorneys to enforce any rights arising out of or relating to this Agreement, and J.K. prevails in any action brought by its attorneys, *Importer shall pay J.K.'s reasonable attorneys' fees, costs and other expenses.*

\*　　\*　　\*

19. This Agreement shall be governed by and construed in accordance with the laws of the State of Maryland.[9]

20. **Limitation of Damages.** In the event of a dispute, Importer consents to limit the damages it may obtain from JK [sic] through any cause of action including J.K.'s negligence, breach of contract, breach of warranty, or violation of the

---

9 The Agreement contains two paragraphs that are each numbered "19." ECF 55-1 at 5-6.

Deceptive Trade Practices Act to no more than two thousand five hundred dollars ($2,500) inclusive of attorney's fees and costs.

J.K. posted bond with U.S. Customs on July 25, 2013, and took possession of the Vehicle. ECF 45-2, ¶ 17. On July 26, 2013, J.K. provided Karr with a "Condition Report," detailing the "relevant operating systems on the Vehicle and checking the engine compartment and trunk." *Id.* ¶ 19.

Weisheit, Griaznov, and Karr met "for several hours" on August 7, 2013. *Id.* ¶ 20. During that meeting, they discussed "research" necessary to convert the Vehicle. *Id.* Additionally, Griaznov and Karr indicated that they "were working on getting" support from McLaren and Gemballa to help facilitate the conversion. *Id.*

On August 8, 2013, J.K. began to prepare a DOT Petition for Import Eligibility (the "Petition") for the Vehicle. *Id.* ¶ 21. According to Weisheit, the Petition contained a detailed plan for conversion, addressing "every Federal Motor Vehicle Safety Standard," including "part numbers and drawings." *Id.* Between July 28, 2013, and August 8, 2013, J.K. "devoted hundreds of hours completing the Petition, including the investigation of each [safety standard] applicable to the Vehicle . . . , research and development for [the] Vehicle's on-board diagnostic system and other tasks, communicating with the shipping company, Griaznov's agents, customs brokers and DOT personnel, locating diagnostic tools, as well as coordination of the logistics, contracts and other submissions. J.K. even took apart several existing automobiles to investigate their computers and hardware." ECF 45-2, ¶ 21. Additionally, "J.K. downloaded and printed parts lists, [and] parts diagrams . . . ." *Id.* ¶ 22.

Weisheit avers that he emailed and spoke with Karr on a regular basis, giving Karr "a detailed status update at least once or twice a week." *Id.* He claims that Karr "was very active in the Petition process." *Id.* According to Weisheit, by the end of September 2013, Griaznov had

not paid an initial deposit to J.K. *Id.* J.K "told Mr. Karr that it would not be filing the Petition until the deposit was paid." *Id.* On October 9, 2013, Griaznov paid J.K. a deposit of $20,500.00. *Id.* ¶¶ 22, 51.

J.K. filed the Petition with DOT on October 25, 2013. *Id.* ¶ 23. And, on November 12, 2013, J.K. provided a "copy of the complete Petition" to Karr, which included "a complete description of the anticipated conversion work including all parts numbers and complete drawings." *Id.*

On December 3, 2013, J.K. received a letter from DOT, requesting revisions to the Petition. *Id.* ¶ 24. Therefore, J.K. revised the Petition and resubmitted it to DOT on December 10, 2013, to include additional parts and drawings. *Id.* The Petition was again revised on January 30, 2014, to correct an error made by DOT as to the year the Vehicle was manufactured. *Id.* ¶ 25.

On February 27, 2014, J.K. sent Karr a copy of "the accepted Petition along with pictures, receipts, part numbers, and diagrams detailing the complete conversion of the Vehicle." ECF 45-2, ¶ 26. And, on March 3, 2014, a copy of the accepted Petition was published on the Federal Register Docket, under number NHTSA-2014-0004. *Id.* The following day, March 4, 2014, J.K. emailed Karr, informing him that the Petition was available on the Federal Register Docket. ECF 45-2, ¶ 26. On that same day, J.K. provided Karr with "a link to the complete Petition including part numbers and drawings." *Id.*

Kenneth Weinstein, a McLaren employee, "submitted comments" on the Petition on March 27, 2014, "in an attempt to block approval" by DOT. *Id.* ¶ 27. On April 15, 2014, McLaren filed comments with DOT, taking "the position that the conversion [of the Vehicle] would not be possible." *Id.* Between May 21, 2014, and July 29, 2014, "J.K.'s staff spent over

150 hours preparing a response to McLaren's comments." *Id.* ¶ 28.  Weisheit asserts, *id.*:

"Because Griaznov and his agents were not able to get the assistance of Gemballa and McLaren

as they promised (and McLaren was, in fact, opposing the Petition), J.K. was forced to spend

considerable time and resources to obtain information to be able to respond to McLaren's

comments."  J.K. responded to McLaren's comments on July 29, 2014.  *Id.*

Then, on August 10, 2014, Karr informed J.K. that Neil Bender "was now the legal

representative for Griaznov." *Id.* ¶ 29.  However, Karr remained a representative for Griaznov

after that date. *See id.* ¶ 31.

Bender emailed J.K. on August 18, 2014, and "purportedly cancelled the [Agreement]

and demanded that J.K. export the Vehicle." *Id.* ¶ 29.  According to Weisheit, in order to

"comply with this demand, J.K. began re-assembling the Vehicle in preparation for exporting it."

*Id.*  Additionally, J.K. explained to Bender and Karr that "J.K. has spent considerable hours in

research and development on the [Vehicle and] that J.K. must to be [sic] paid for this time, as

well as for the time it would take to re-assemble the Vehicle for exporting."  ECF 45-2, ¶ 29.

Weisheit avers that "Mr. Bender and Mr. Karr acknowledged this and instead requested that J.K.

continue with the Petition comment process and conversion of the Vehicle." *Id.*

On November 19, 2014, DOT published J.K.'s response to McLaren's comments.  ECF

45-2, ¶ 30.  Then, in January 2015, Karr again "reversed course" and told J.K. that Griaznov

wanted to "export the Vehicle." *Id.* ¶ 31.  At that juncture, Karr acknowledged "Griaznov's

contractual obligation to pay for all of the research and development conducted to date, as well

as the agency fees and storage." *Id.*  However, "[a]fter further consideration," Griaznov "again

requested that J.K. continue with the Petition and conversion processes." *Id.*

On March 26, 2015, DOT concluded that the Vehicle was "readily able to be modified" so as to satisfy DOT standards. *Id.* ¶ 32. And, on April 3, 2015, the Vehicle was added to the Eligibility List. *Id.* Karr notified J.K. that he "wanted to obtain the parts on his own to complete the conversion of the Vehicle." *Id.* ¶ 34. Weisheit avers that "from the beginning, J.K. was relying on Plaintiff and Mr. Karr's representations that they would be able to procure the parts from the manufacturers," *i.e.*, McLaren and/or Gemballa. *Id.* Despite Karr's "assurances that he had connections with McLaren and Gemballa, Mr. Karr was unable to get the parts for the Vehicle. Indeed, McLaren refused to sell the necessary parts to anyone, including J.K." *Id.* As a result, "J.K. was forced to spend significant time and resources tracking down and obtaining the parts necessary for the conversion of the Vehicle." *Id.* ¶ 35. J.K. employees Reinaldo Benjumea and Joyeusaz flew to California "to source, inspect, and purchase several parts required for the conversion." *Id.* ¶ 36. In all, J.K. "spent over 100 hours in its efforts to obtain the parts necessary for the conversion of the Vehicle." *Id.* ¶ 35.

Ultimately, J.K. purchased multiple parts. ECF 45-2, ¶¶ 35-37. Further, J.K. rewired "the entire vehicle with compliant systems." *Id.* ¶ 37.

On May 15, 2015, "J.K. sent Mr. Karr a list of the parts sourced by J.K. to complete the conversion. The list included the prices of those parts." *Id.* ¶ 38. Thereafter, on an unspecified date, Karr "demand[ed] the Vehicle be exported out of the United States without paying J.K. for the services J.K. provided." *Id.* ¶ 39. Weisheit avers, *id.* ¶ 40: "Because the Vehicle was in this country on J.K.'s bond, and was the only security that J.K. had to ensure payment, J.K. was not willing to export the Vehicle out of the United States without first receiving all amounts due under the Contract." Additionally, Weisheit avers that, "[p]rior to the Vehicle being converted to

meet United States standards, it was considered contraband and could not be sold, offered for sale, or even driven" in the United States. *Id.*

J.K. sent an invoice to Griaznov on June 30, 2015. ECF 45-5 at 4-5 (Invoice # 1965, dated June 30, 2015). The invoice listed parts in the amount of $29,919.87, labor in the amount of $8,100.00, and storage fees in the amount of $3,050.00, for a total sum of $41,069.87. *See id.*; *see also* ECF 45-2, ¶ 41. According to Weisheit, Griaznov "refused to pay this invoice so the vehicle remained in J.K.'s facility." ECF 45-2, ¶ 41. However, because J.K. was "obligated by the EPA and DOT rules and regulations, the bond, and the terms of the [Agreement], J.K. completed the conversion of the Vehicle," despite Griaznov's failure to pay. *Id.* ¶ 42.

After J.K. completed the conversion of the Vehicle, it "was required . . . to have the manufacturer of the Vehicle (McLaren) remedy any recalls." *Id.* ¶ 43; *see* ECF 55-1, ¶ 9. Accordingly, on June 14, 2016, J.K. sent the Vehicle to a McLaren facility, where "multiple factory recalls" were performed. ECF 45-2, ¶ 43. According to Weisheit, McLaren also "serviced and inspected" the Vehicle. *Id.*

On June 20, 2016, J.K. provided DOT with the "final report detailing and documenting the conversion" of the Vehicle. ECF 45-2, ¶ 44. And, DOT released the bond on the Vehicle on August 12, 2016. *Id.* ¶ 45. On August 15, 2016, J.K. paid the EPA fees for the Vehicle, in the amount of $2,785.97. *Id.* ¶ 46. And, on August 30, 2016, J.K. "made the final submission for inspection to the EPA." *Id.* ¶ 47. Subsequently, the bonds that J.K. had posted with the EPA and U.S. Customs were released. *Id.* Therefore, the Vehicle is "able to be released into the commerce of the United States . . . ." *Id.* ¶ 48. According to J.K., the conversion has increased the value of the vehicle. *Id.*

J.K. filed the Motion on October 3, 2017. *See* ECF 45. According to Weisheit, as of September 30, 2017, $177,412.82 remained due and owing to J.K. from Griaznov. ECF 45-2, ¶ 52. That amount includes, *id.*:

- Regulatory customs bond, title, and inspection fees in the amount of $17,989.44.

- Costs and expenses related to the Petition comment and approval process in the amount of $1,945.00.

- Research and development costs in the amount of $55,703.25.

- Travel expenses related to the procurement of conversion parts in the amount of $3,415.26.

- Purchase of parts required for conversion of the Vehicle totaling $35,109.87.

- Labor related to the conversion and programming of the Vehicle in the amount of $25,100.00. This includes 60 hours of labor at J.K.'s standard rate of $135 per hour, $5,000.00 for DOT programming for advanced airbags, and $12,000.00 for EPA programming . . . .

- Storage Fees from July 25, 2013 through September 30, 2017 at a rate of $25.00 per day in the amount of $38,150.00.

*See also* ECF 45-5 at 7-8 (Invoice # 2020, dated September 9, 2016).

Weisheit contends that the only payment made to J.K. by Griaznov was the initial deposit of $20,500.00, paid on October 9, 2013. ECF 45-2, ¶ 51. J.K.'s invoices are docketed at ECF 45-5.

The Clerk mailed a letter to Griaznov on October 3, 2017, informing him, *inter alia*, that J.K. had filed a motion for summary judgment, which, if granted, "could result in . . . the entry of judgment against" him. ECF 46 ("Rule 12/56 Letter"). Additionally, the Rule 12/56 Letter notified Griaznov of his "right to file a response to th[e] motion within seventeen (17) days from the date of this letter," *i.e.*, by October 20, 2017. *Id.* Griaznov did not file an opposition to the Motion within the time provided.

On December 22, 2017, Griaznov belatedly filed a motion for extension of time to respond to the Motion (ECF 49), in which he acknowledged receipt of the Rule 12/56 Letter in October 2017. *Id.* ¶ 5. He did not explain why he had waited more than two months to request additional response time. Nonetheless, he claimed that he "needs more time to either hire new counsel or file a pro se response" to the Motion. *Id.* ¶ 6. J.K. opposed that motion. ECF 50. However, by Order of January 10, 2018 (ECF 53), I allowed Griaznov to file an opposition to the Motion, due by January 19, 2018.

Griaznov filed his pro se Opposition (ECF 54) on January 19, 2018, stating that "[a]ll discovery, including depositions, have yet to take place." *Id.* ¶ 3. Further, Griaznov averred that J.K. was "taking advantage of the time period within which [Griaznov was] seeking alternate counsel to handle this complex matter." *Id.* ¶ 4. As to the substance of the Motion, Griaznov averred that J.K.'s "original estimate to convert the vehicle at issue as indicated in the agreement was $18,000.00 and [J.K.] now claims $177,412.82. The court should not allow [J.K.] to extort [Griaznov] of this amount while [he was] still trying to retain new counsel." *Id.* ¶ 5. Griaznov submitted no exhibits with his Opposition to the Motion.

J.K. filed a Reply on January 30, 2018 (ECF 55), stating, *inter alia*, that Griaznov "failed to put forth any admissible evidence demonstrating the existence of a dispute of material fact." *Id.* ¶ 1. Further, J.K. asserted that "Griaznov appears to be unaware of the fact that written discovery was conducted in accordance with the Court's Scheduling Order. The only discovery that did not take place was deposition discovery. . . . [But] Griaznov. . . has never agreed to appear for deposition." *Id.* ¶ 3. Moreover, J.K. asserted that the text of the Agreement put Griaznov on notice that conversion costs would exceed $18,000.00 if the Vehicle required, *inter*

*alia*, parts for its emissions or safety systems, labor, research and development, and/or testing to "bring the vehicle into conformity with" federal specifications. *Id.* ¶ 5; *see* ECF 55-1.

Additional facts are presented below.

## II.    Discovery

Griaznov filed suit on July 8, 2016. *See* ECF 1. J.K. lodged its countersuit on September 12, 2016. *See* ECF 7. And, on November 3, 2016, the parties agreed to "maintain the *status quo*." ECF 19-2 ("Status Quo Letter"). In particular, J.K. agreed to "refrain from altering, modifying, damaging, destroying, and/or selling the Vehicle," and to retain the Vehicle "in a secured location while the [case] is pending." *Id.* The Amended Complaint was filed on March 16, 2017. ECF 34.[10]

The initial Scheduling Order was issued on October 5, 2016. ECF 12. At that point, the parties were entitled to begin discovery. At that time, plaintiff had counsel. Defendant contends in ECF 55 that written discovery was conducted in accordance with the Court's Scheduling Order.

At the joint request of the parties, the Scheduling Order was modified in December 2016, because, *inter alia*, the parties had "difficulty scheduling depositions in advance of the discovery deadline. Among other reasons, Plaintiff and his agent, Eugene Karr, reside in Russia and it is not known at this time when they will be available for their respective depositions." ECF 21 (Joint Motion to Modify the Scheduling Order); *see* ECF 22 (Order of December 13, 2016, granting ECF 21). The Scheduling Order was again modified three other times. *See* ECF 26

---

[10] By Memorandum (ECF 27) and Order of March 8, 2017 (ECF 28), I granted, in part, plaintiff's motion to amend the Complaint. *See* ECF 17; ECF 18. J.K. had opposed the proposed amendment. ECF 19. Then, on March 10, 2016, plaintiff again moved to amend, to add newly discovered facts. I granted that motion, in part, by Order of March 16, 2017. ECF 33.

(Order of February 17, 2017); ECF 36 (Order of March 27, 2017); ECF 44 (Order of August 28, 2017).

In the interim, on June 6, 2017, the parties submitted a "Joint Motion to Stay and for Early Settlement Conference," asking the Court to stay the litigation pending a settlement conference. *See* ECF 38. By Order of that same date (ECF 39), I granted the parties' motion to stay. However, the parties never pursued a settlement conference. *See* Docket. According to J.K., defendant failed to participate. ECF 55, ¶ 6.

Then, on August 17, 2017, counsel for Griaznov moved to withdraw from the litigation (ECF 40), stating, *inter alia*, that "continued representation [would] result in an unreasonable financial burden." *Id.* ¶¶ 1-3. By Order of August 18, 2017 (ECF 41), I granted the motion. Although Griaznov indicated that he was looking for new legal counsel (ECF 49), no attorney ever entered an appearance on his behalf. *See* Docket.

On August 23, 2017, J.K. asked the Court to lift the stay and to issue a modified Scheduling Order. *See* ECF 43. By Order of August 28, 2017 (ECF 44), I lifted the stay. I also modified the Scheduling Order and established, *inter alia*, yet another discovery deadline -- December 8, 2017. ECF 44 at 2.

According to defendant, plaintiff never agreed to a deposition. ECF 55, ¶ 3. Moreover, defense counsel claims that he never "received a single communication from Griaznov." *Id.* ¶ 6.

At the close of discovery on December 8, 2017, J.K. filed a Status Report (ECF 47), informing the Court that, *inter alia*, "the parties have exchanged answers to interrogatories, responses to requests for the production of documents, and have produced documents." *Id.* at 1. Further, J.K. stated that it had "previously noted the deposition of [Griaznov], however, [he] refused to be deposed in the State of Maryland." *Id.*

In sum, the first Scheduling Order of October 5, 2016 (ECF 12) set a discovery deadline of February 3, 2017. *Id.* at 2. Until August 2017, plaintiff was represented by counsel. As indicated, discovery was extended until December 8, 2017. Even allowing for the brief stay, the discovery period amounted to about one year. In all that time, the Court was never made aware of any difficulty encountered by plaintiff regarding discovery.

Plaintiff's effort to avoid summary judgment by way of his belated assertion of his need for discovery (ECF 54) is without merit.

### III. Standard of Review

J.K. has moved for summary judgment (ECF 45), both as to Griaznov's Amended Complaint (ECF 34) and its own Counterclaim. ECF 7.

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *see also Formica v. Aylor*, ___ F. App'x ___, 2018 WL 3120790, at *7 (4th Cir. June 25, 2018); *Iraq Middle Mkt. Dev. Found. v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017). The nonmoving party must demonstrate that there are disputes of material fact so as to preclude the award of summary judgment as a matter of law. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986); *see also Gordon v. CIGNA Corp.*, 890 F.3d 463, 470 (4th Cir. 2018).

The Supreme Court has clarified that not every factual dispute will defeat a summary judgment motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material*

fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018); *Sharif v. United Airlines, Inc.*, 841 F.3d 199, 2014 (4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252. And, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

Notably, "[a] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 514 U.S. 1042 (2004); *see also Celotex*, 477 U.S. at 322-24. And, the court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. Ltd.*, 475 U.S. at 587; *accord Variety Stores, Inc.*, 888 F.3d at 659; *Gordon*, 890 F.3d at 470; *Roland v. United States Citizenship & Immigration Servs.*, 850 F.3d 625, 628 (4th Cir. 2017); *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at

249; *accord Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Thus, in considering a summary judgment motion, the court may not make credibility determinations. *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007). Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).

In sum, to avoid summary judgment, there must be a genuine dispute as to material fact. In *Iraq Middle Mkt. Dev. Found.*, 848 F.3d at 238, the Court reiterated: "A court can grant summary judgment only if, viewing the evidence in the light most favorable to the non-moving party, the case presents no genuine issues of material fact and the moving party demonstrates entitlement to judgment as a matter of law."

## IV. Discussion

The Amended Complaint contains claims of replevin, trespass to chattels, trover and conversion, breach of contract, and violation of C.L. §§ 13-101 *et seq.* ECF 34. Additionally, Griaznov seeks a declaration that the Maryland Garageman's Lien Statute, C.L. § 16-202(c)(1), is preempted by the Safety Act, 49 U.S.C. §§ 30101 *et seq.* *Id.* Further, he asks the Court to prohibit J.K. from "using, altering, damaging, destroying, or selling the Vehicle," and to require J.K. to "restore the Vehicle to its original condition . . . ." *Id.* at 7-8.

In the Counterclaim (ECF 7), J.K. avers that Griaznov breached the Agreement by refusing to pay J.K. for parts, labor, and other costs associated with the conversion.

## A. The Safety Act And The Garageman's Lien Statute

### 1.

In the Amended Complaint, Griaznov contends that, "if an RI does not intend to convert a vehicle following [DOT's] approval of an import eligibility petition," under the Safety Act, "the RI must export, abandon, or destroy the vehicle." ECF 34, ¶ 97 (emphasis added). Griaznov asserts that the Garageman's Lien Statute, which allows J.K. to retain possession of a vehicle subject to a lien, "conflicts with" the Safety Act. *Id.* ¶ 98. In particular, Griaznov claims that J.K. failed to "export the Vehicle" after "cancellation" of the Agreement by Griaznov, and he is entitled to a declaration stating that "[f]ederal law preempts [the] inconsistent state law." *Id.* ¶¶ 99, 102. But, he does not direct the Court to any specific provision of the Safety Act. Moreover, he has acknowledged that, under 49 U.S.C. § 30103, "Congress expressly evidenced its intent to preempt State Laws [only] to the extent such laws prescribe a lesser standard . . . ." *Id.* ¶ 100.

In the Motion, J.K. points out that "the Vehicle has been in conformance with all federal standards since the DOT and EPA bonds were released in August of 2016." ECF 45-1 at 24 (citing ECF 45-2, ¶¶ 45, 47). Because the Vehicle is in compliance with the Safety Act, J.K. argues the Vehicle is not required to be exported or destroyed. *Id.* Moreover, J.K. contends that the Safety Act does not preempt Maryland's Garageman's Lien law, and J.K. has a valid lien on the Vehicle. *Id.*

Griaznov does not address the Safety Act or the Garageman's Lien Statute in his Opposition. *See* ECF 54.

**2.**

Federal preemption of state law under the Supremacy Clause is "fundamentally . . . a question of congressional intent." *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990). The Supreme Court has recognized that there are three ways by which Congress manifests that intent: (1) when Congress explicitly defines the extent to which its enactment preempts state law (express preemption); (2) when state law "regulates conduct in a field that Congress intended the Federal Government to occupy exclusively" (field preemption); and (3) when state law "actually conflicts with federal law" (conflict preemption). *Id.* at 78-79. *See Cox v. Duke Energy, Inc.*, 876 F.3d 625, 635 (4th Cir. 2017); *Anderson v. Sara Lee Corp.*, 508 F.3d 181, 191 (4th Cir. 2007).

"[S]tate law is naturally preempted to the extent of any conflict with a federal statute." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). This is "because the federal Constitution provides that every federal enactment is superior to any state law or constitutional article." *Drager v. PLICA USA, Inc.*, 741 F.3d 470, 475 (4th Cir. 2014) (citing U.S. CONST. art. VI, cl. 2).

There are different types of conflict preemption. One is "obstacle" preemption. It applies "where State law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Columbia Venture, LLC v. Dewberry & Davis, LLC*, 604 F.3d 824, 829-30 (4th Cir. 2010) (quoting *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995)). Courts sometimes describe this branch of preemption as "frustration of federal purpose." *Abbot by Abbot v. Am. Cyanamid Co.*, 844 F.2d 1108, 1113 (4th Cir. 1988).

The Fourth Circuit explained in *Abbot by Abbot*, 844 F.2d at 1113, that courts should consider the interests of the national and state policies when analyzing obstacle preemption:

A decision about [obstacle preemption] requires the court independently to consider national interests and their putative conflict with state interests. While preemption under a theory of express or implied preemption is essentially a matter of statutory construction, preemption under [obstacle preemption] theory is more an exercise of policy choices by a court than strict statutory construction. An independent judgment that federal purposes require preemption comes in the face of congressional silence, both express and implied, on the subject.

Griaznov alleges conflict preemption in his Amended Complaint. *See* ECF 34, ¶¶ 97-102. He also asserts that "'field'" preemption is clearly implied. *Id.* ¶ 101.

Pursuant to 49 U.S.C. § 30112(a)(1) of the Safety Act, "a person may not . . . import into the United States, any motor vehicle . . . unless the vehicle . . . complies" with Federal Motor Vehicle Safety Standards ("FMVSS"). However, under 49 U.S.C. §§ 30141(a)(1) and (2), a nonconforming motor vehicle may be imported into the United States, "if . . . on petition of a manufacturer or importer registered under . . . this section, the Secretary decides . . . the vehicle is . . . capable of being readily altered to comply with applicable motor vehicle safety standards prescribed under this chapter," and "the vehicle is imported by a registered importer." *Id.*

DOT utilizes regulatory procedures to determine which imported motor vehicles satisfy the requirements of 49 U.S.C. §§ 30141(a)(1) and (2). In particular, "The Secretary of Transportation shall establish by regulation procedures for making a decision under subsection (a)(1) of this section . . . that the motor vehicle is capable of being brought into compliance with applicable motor vehicle safety standards prescribed under this chapter." 49 U.S.C. § 30141(b)(1). Further, "the Secretary shall provide for a minimum period of public notice and written comment . . . ." *Id.* And, "the Secretary shall consider test information and other information available to the Secretary, including any information provided by the manufacturer. . . ." 49 U.S.C. § 30141(b).

Pursuant to 49 U.S.C. § 30141(d)(1)(A), a person who imports a motor vehicle "shall provide a bond . . . and comply with the terms the Secretary of Transportation decides are appropriate to ensure that the vehicle . . . will comply with applicable motor vehicle safety standards . . . ." 49 U.S.C. § 30141(d)(1)(A). If the person importing the motor vehicle does not "comply with applicable motor vehicle safety standards," the vehicle "will be exported (at no cost to the United States Government) by the Secretary of the Treasury or abandoned to the Government." 49 U.S.C. § 30141(d)(1)(B).

The Maryland Garageman's Lien Statute provides, in part, C.L. §§ 16-202(c)(1), (c)(2):

(c)(1) Any person who, with the consent of the owner, has custody of a motor vehicle and who, at the request of the owner, provides a service to or materials for the motor vehicle, has a lien on the motor vehicle for any charge incurred for any:

(i) Repair or rebuilding;

(ii) Storage; or

(iii) Tires or other parts or accessories.

(2) A lien is created under this subsection when any charges set out under paragraph (1) of this subsection giving rise to the lien are incurred.

Under C.L. § 16-203, a lienor may retain possession of the property until the charges that give rise to lien are paid, or the lien is discharged. And, under C.L. § 16-207, if the charges that give rise to the lien are unpaid within 30 days, the lienor may sell the property at a public sale.

In *Allstate Lien & Recovery Corp. v. Stansbury*, 445 Md. 187, 200-03, 126 A.3d 40, 48-49 (2015), the Maryland Court of Appeals explained the process by which a garageman's lien is created and enforced. It said, *id.* (quoting *Friendly Fin. Corp. v. Orbit Chrysler Plymouth Dodge Truck, Inc.*, 378 Md. 337, 345-47, 835 A.2d 1197, 1202-03 (2003)):

"The Maryland General Assembly, when it enacted the provisions relating to garageman's liens, envisioned that the statute would operate according to the following sequence of events:

(1) The owner in possession of the motor vehicle takes it (or has it towed) to the garage and requests that it be repaired. § 16–202(c)(1).[]

(2) The garage performs the requested repairs, creating a lien in favor of [the] garage for the repair bill, and bills the owner. § 16–202(c)(2)(i).[]

(3) The owner fails to pay the bill.

(4) The garage stores the vehicle, creating a lien in favor of the garage for storage costs. § 16–202(c)(1)(ii).

(5) The garage retains possession of the vehicle until either the charges are paid or the lien is otherwise discharged. § 16–203(a).[]

(6) The garage, within 30 days of the creation of the lien, sends notice of the lien to all holders of perfected security interests. § 16–203(b)(1)(i).[]

(7) If the bill remains unpaid for 30 days, the garage, at its option, may initiate a public sale of the vehicle. § 16–207(a).[]

(8) The garage sends notice, at least 10 days prior to sale, to the owner, all holders of perfected security interests, and the Motor Vehicle Administration. § 16–207(b)(2).[]

(9) The garage publishes notice once a week for the two weeks immediately preceding the sale in one or more newspapers of general circulation in the county where the sale is to be held. § 16–207(b)(1).[]

(10) The garage sells the vehicle. § 16–207.

(11) Proceeds of sale are applied as follows: § 16–207(e)(1)(i).[]

    i. Expenses of the sale. § 16–207(e)(1)(ii).

    ii. Third-party storage fees. § 16–207(e)(1)(ii).

    iii. The lien claim for garage repair and storage bills. § 16–207(e)(1)(iii).

    iv. Any purchase money security interest. § 16–107(e)(1)(iv).

    v. Any remaining secured parties of record. § 16–207(e)(1)(v).

    vi. Any remaining balance to the owner. § 16–207(e)(4).[]"

**3.**

As noted, on July 12, 2013, the parties executed the Agreement, in which Griaznov agreed "to contract with J.K. for conversion and compliance work on the vehicle . . . ." ECF 55-1, ¶ G. Further, Griaznov acknowledged that failure to satisfy the terms of the Agreement could result in a lien being placed on the Vehicle "in order to pay . . . for work completed." *Id.* ¶ 11.

On July 25, 2013, J.K. posted bond for the Vehicle, pursuant to 49 U.S.C. § 30141(d)(1)(A), and took possession of the Vehicle on that same day. *See* ECF 45-2, ¶ 17.

After that date, if J.K. had failed to "comply with applicable motor vehicle safety standards," the Vehicle would have been "exported (at no cost to the United States Government) by the Secretary of the Treasury or abandoned to the Government." 49 U.S.C. § 30141(d)(1)(B).

Between July 26, 2013, and October 9, 2013, J.K. performed substantial research and labor to prepare the Petition for DOT. *See* ECF 45-2, ¶¶ 17-22. On October 9, 2013, Griaznov paid a deposit to J.K., in the approximate amount of $20,500.00. *Id.* ¶¶ 22, 51. The Petition was filed with DOT on October 25, 2013. *Id.* ¶ 23. Between that date and August 30, 2016, when J.K. made the final EPA submissions, J.K. completed additional work to convert the Vehicle. *See* ECF 45-2, ¶¶ 23-48.

Griaznov asserts in the Amended Complaint that the Garageman's Lien Statute is preempted by the Safety Act, stating: ECF 1, ¶ 38: "[I]f an RI does not intend to convert a vehicle following [DOT] approval of an import eligibility petition, the RI must export, abandon, or destroy the vehicle." According to Griaznov, when J.K. retained the Vehicle pursuant to the Garageman's Lien Statute, a conflict was caused with the Safety Act. *Id.* ¶ 42; *see also* ECF 34, ¶ 97.

The record reflects that, in accordance with plaintiff's request, J.K. converted the Vehicle. Indeed, J.K.'s research and labor resulted in DOT releasing its bond on the Vehicle on August 12, 2016, and the EPA releasing its bond on or about August 30, 2016. ECF 45-2, ¶¶ 45-47. Accordingly, the Vehicle did not need to be "exported . . . by the Secretary of the Treasury or abandoned to the Government," pursuant to the Safety Act. *See* 49 U.S.C. § 30141(d)(1)(B).

In August 2016, shortly after Griaznov filed suit, the Vehicle was "able to be released into the commerce of the United States," without violating the Safety Act. ECF 45-2, ¶ 48; *see* 49 U.S.C. § 30141(d)(1)(B). Approximately six months later, on March 16, 2017, Griaznov filed

the Amended Complaint, maintaining that the Safety Act preempts the Garageman's Lien Statute, despite the fact J.K. had fully converted the Vehicle, pursuant to the Safety Act. *See* ECF 34. The export and abandonment provisions of the Safety Act, 49 U.S.C. § 30141(d)(1)(B), were of no consequence, because the Vehicle had been released by DOT and EPA.

The doctrines of conflict and field preemption do not foreclose a claim under the Garageman's Lien Statute. This case does not present an issue of preemption.

## B. Breach of Contract

### 1.

Griaznov asserts in the Amended Complaint: "After discovering the exorbitant prices that Defendant intended to charge for parts and labor, [he] cancelled the [Agreement] and demanded that the Vehicle be exported to Russia." ECF 34, ¶ 110. He does not specify the date on which he cancelled the Agreement. However, he points out that he was entitled to terminate the Agreement "upon thirty (30) days' notice" to J.K. *Id.* ¶ 109. And, he alleges that J.K. refused to export the Vehicle to Russia. *Id.* ¶ 111. Moreover, he avers that "at no time did [he] approve the purchase of any part or provision of any labor associated with the conversion of the Vehicle." *Id.* ¶ 113. Therefore, he contends that he "is entitled to a refund of $16,920" from J.K., *i.e.*, $18,000.00 from the initial deposit, less $1,080.00 in research fees. *See id.* ¶¶ 104, 112, 114.[11]

J.K. claims that Griaznov's allegations "are baseless because the alleged breaches do not violate or run contrary to the Contract in any way." ECF 45-1 at 24. According to J.K., it satisfied its obligations under the Agreement when it converted the Vehicle. *Id.* And, J.K. argues that Griaznov breached the Agreement by refusing to pay J.K. for the conversion. *Id.* In

---

[11] As noted, Weisheit avers that on October 9, 2013, Griaznov paid a deposit of $20,500.00. *See* ECF 45-2, ¶¶ 22, 51.

the Motion, J.K. seeks $177,412.82 from Griaznov, plus attorneys' fees and costs, through September 30, 2017.  ECF 45-2, ¶ 52.

Griaznov's Opposition sheds no light on the issue of breach of contract.

**2.**

Pursuant to the terms of the Agreement, J.K. and Griaznov agreed that the laws of Maryland shall govern the Agreement.  *See* ECF 55-1, ¶ 19 ("This Agreement shall be governed by and construed in accordance with the laws of the State of Maryland.").  No party has challenged this provision of the Agreement.  Accordingly, I shall review the principles of Maryland contract law.

In general, a contract is defined as "a promise or set of promises for breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty." RICHARD A. LORD, 1 WILLISTON ON CONTRACTS § 1:1, at 2-3 (4th ed. 1990); *accord* RESTATEMENT (SECOND) CONTRACTS § 1, at 5 (1981); *see also Maslow v. Vanguri*, 168 Md. App. 298, 321, 896 A.2d 408, 421-22, *cert. denied*, 393 Md. 478, 903 A.2d 416 (2006).  "'A contract is formed when an unrevoked offer made by one person is accepted by another.'"  *Cty. Comm'rs for Carroll Cty. v. Forty W. Builders, Inc.*, 178 Md. App. 328, 377, 941 A.2d 1181, 1209 (2008) (quoting *Prince George's Cty. v. Silverman*, 58 Md. App. 41, 57, 472 A.2d 104, 112 (1984)).  Thus, mutual assent is an integral component of every contract.  *See, e.g., Cochran v. Norkunas*, 398 Md. 1, 14, 919 A.2d 700, 708 (2007); *Advance Telecom Process, LLC v. DSFederal, Inc.*, 224 Md. App. 164, 177, 119 A.3d 175, 183 (2015).

The elements of a claim for breach of contract are "'contractual obligation, breach, and damages.'"  *Tucker v. Specialized Loan Servicing, LLC*, 83 F. Supp. 3d 635, 655 (D. Md. 2015) (quoting *Kumar v. Dhanda,* 198 Md. App. 337, 345, 17 A.3d 744, 749 (2011)).  To "prevail in an

action for breach of contract, a plaintiff must prove that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation." *Taylor v. Nations Bank, N.A.*, 365 Md. 166, 175, 776 A.2d 645, 651 (2001); *accord Belyakov v. Med. Sci. & Computing*, 86 F. Supp. 3d 430, 437 (D. Md. 2015); *see also RRC Northeast, LLC v. BAA Md., Inc.*, 413 Md. 638, 658, 994 A.2d 430, 442 (2010). In other words, "[i]t is the parties' agreement that ultimately determines whether there has been a breach." *Mathis v. Hargrove*, 166 Md. App. 286, 318-19, 888 A.2d 377, 396 (2005).

In *Polek v. J.P. Morgan Chase Bank, N.A.*, 424 Md. 333, 362, 36 A.3d 399, 416 (2012), the Maryland Court of Appeals said: "Maryland law requires that a [party] alleging a breach of contract 'must of necessity allege with certainty and definiteness *facts* showing a contractual obligation owed by the defendant to the plaintiff and a breach of that obligation by defendant.'" (citation omitted) (emphasis in *Polek*); *see also Robinson v. GEO Licensing Co., L.L.C.*, 173 F. Supp. 2d 419, 423 (D. Md. 2001).

To determine whether there is an enforceable contract, courts begin the "analysis by discussing the essential prerequisite of mutual assent to the formation of a contract . . . ." *Falls Garden Condo. Ass'n, Inc. v. Falls Homeowners Ass'n, Inc.*, 441 Md. 290, 302, 107 A.3d 1183, 1189 (2015); *see also Mitchell v. AARP*, 140 Md. App. 102, 116, 779 A.2d 1061, 1069 (2001) ("An essential element with respect to the formation of a contract is 'a manifestation of agreement or mutual assent by the parties to the terms thereof; in other words, to establish a contract the minds of the parties must be in agreement as to its terms.'") (citations omitted). "Manifestation of mutual assent includes two issues: (1) intent to be bound, and (2) definiteness of terms." *Cochran*, 398 Md. at 14, 919 A.2d at 708.

A contract may be oral or written, as well as express or implied. "'An express contract has been defined as an actual agreement of the parties, the terms of which are openly uttered or declared at the time of making it, being stated in distinct and explicit language, either orally or in writing.'" *Md. Cas. Co. v. Blackstone Int'l Ltd.*, 442 Md. 685, 706, 114 A.3d 676, 688 (2015) (quoting *Cty. Comm'rs of Caroline Cty. v. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 94, 747 A.2d 600, 606 (2000)). Whether oral or written, a contract must express with certainty the nature and extent of the parties' obligations and the essential terms of the agreement. *Forty W. Builders, Inc.*, 178 Md. App. at 377-78, 941 A.2d at 1209-10; *see Canaras v. Lift Truck Servs.*, 272 Md. 337, 346, 322 A.2d 866, 871 (1974). If an agreement omits an important term, or is otherwise too vague or indefinite with respect to an essential term, it is not enforceable. *Mogavero v. Silverstein*, 142 Md. App. 259, 272, 790 A.2d 43, 51 (2002); *see L & L Corp. v. Ammendale*, 248 Md. 380, 385, 236 A.2d 734, 737 (1967).

Under Maryland law, the interpretation of a contract is "ordinarily a question of law for the court." *Grimes v. Gouldmann*, 232 Md. App. 230, 235, 157 A.3d 331, 335 (2017); *see also Spacesaver Sys., Inc. v. Adam*, 440 Md. 1, 7, 98 A.3d 264, 268 (2014); *Myers v. Kayhoe*, 391 Md. 188, 198, 892 A.2d 520, 526 (2006); *Towson Univ. v. Conte*, 384 Md. 68, 78, 862 A.2d 941, 946 (2004); *Lema v. Bank of Am., N.A.*, 375 Md. 625, 641, 826 A.2d 504, 513 (2003); *Under Armour, Inc. v. Ziger/Snead, LLP*, 232 Md. App. 548, 552, 158 A.3d 1134, 1136 (2017). This includes the determination of whether a contract is ambiguous. *Sy-Lene of Wash., Inc. v. Starwood Urban Retail II, LLC*, 376 Md. 157, 163, 829 A.2d 540, 544 (2003).

"'The cardinal rule of contract interpretation is to give effect to the parties' intentions.'" *Dumbarton Imp. Ass'n. Inc. v. Druid Ridge Cemetery Co.*, 434 Md. 37, 51, 73 A.3d 224, 232 (2013) (citation omitted). To determine the parties' intentions, courts look first to the written

language of the contract. *Walton v. Mariner Health of Md., Inc.*, 391 Md. 643, 660, 894 A.2d 584, 594 (2006) ("[G]enerally, when seeking to interpret the meaning of a contract our search is limited to the four corners of the agreement."); *Hartford Acc. & Indem. Co. v. Scarlett Harbor Assoc. Ltd. P'ship*, 109 Md. App. 217, 291, 674 A.2d 106, 142 (1996) ("[T]he court must, as its first step, determine from the language of the agreement what a reasonable person in the position of the parties would have meant at the time the agreement was effectuated."), *aff'd,* 346 Md. 122, 695 A.2d 153 (1997).

As the Fourth Circuit stated recently, "Maryland adheres to the objective theory of contracts, 'giving effect to the clear terms of the contract regardless of what the parties to the contract may have believed those terms to mean.'" *Sky Angel U.S., LLC v. Discovery Commc'ns, LLC*, 885 F.3d 271, 277 (4th Cir. 2018) (quoting *Conte*, 384 Md. at 78, 862 A.2d at 946-47); *see Cochran*, 398 Md. at 16, 919 A.2d at 709; *Huggins v. Huggins & Harrison, Inc.*, 220 Md. App. 405, 417, 103 A.3d 1133, 1139 (2014). The court's "task, therefore, when interpreting a contract, is not to discern the actual mindset of the parties at the time of the agreement." *Dumbarton*, 434 Md. at 52, 73 A.3d at 232. Rather, the court is to "'determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated.'" *Id.* (quoting *General Motors Acceptance v. Daniels,* 303 Md. 254, 261, 492 A.2d 1306, 1310 (1985)).

As indicated, to determine the parties' intentions, courts first look to the written language of the contract. *See Walton*, 391 Md. at 660, 894 A.2d at 594. "'The words employed in the contract are to be given their ordinary and usual meaning, in light of the context within which they are employed.'" *DIRECTV, Inc. v. Mattingly*, 376 Md. 302, 313, 829 A.2d 626, 632-33 (2003) (citations omitted). A court will presume that the parties meant what they stated in an

unambiguous contract, without regard to what the parties to the contract personally thought it meant or intended it to mean. *See Dumbarton*, 434 Md. at 51, 73 A.3d at 232; *Dennis v. Fire & Police Employees Ret. Sys.*, 390 Md. 639, 656, 890 A.2d 737, 747 (2006); *PaineWebber Inc. v. East*, 363 Md. 408, 414, 768 A.2d 1029, 1032 (2001); *see also, e.g.*, *Scarlett Harbor,* 109 Md. App. at 291, 674 A.2d at 142 ("Where the language of a contract is clear, there is no room for construction; it must be presumed that the parties meant what they expressed.").

"In making this determination, courts should focus on 'the entire language of the agreement, not merely a portion thereof' and apply 'the customary, ordinary and accepted meaning of the language used.'" *Sky Angel*, 885 F.3d at 277 (quoting *Nova Research, Inc. v. Penske Truck Leasing Co.*, 405 Md. 435, 448, 952 A.2d 275, 283 (2008)). Moreover, a court will not "add or delete words to achieve a meaning not otherwise evident from a fair reading of the language used." *Brensdel v. Winchester Constr. Co.*, 392 Md. 601, 623, 898 A.2d 472, 485 (2006). Indeed, "[i]t is a fundamental principle of contract law that it is 'improper for the court to rewrite the terms of a contract, or draw a new contract for the parties, when the terms thereof are clear and unambiguous, simply to avoid hardships.'" *Calomiris v. Woods*, 353 Md. 425, 445, 727 A.2d 358, 368 (1999) (quoting *Canaras v. Lift Truck Servs.*, 272 Md. 337, 350, 322 A.2d 866, 873 (1974)); *see Loudin Ins. Agency, Inc. v. Aetna Cas. & Sur. Co.*, 966 F.2d 1443 (Table), 1992 WL 145269, at *5 (4th Cir. 1992) (per curiam) ("[A] court will not rewrite the parties' contract simply because one party is no longer satisfied with the bargain he struck.").

### 3.

Griaznov claims that he properly cancelled the Agreement and thus he owes no money to J.K. To the contrary, he claims that J.K. owes him $16,920.00 under the Agreement.

The Agreement states that both J.K. and Griaznov had "the right to terminate this Agreement for any reason upon thirty (30) days of notice to the other party." ECF 55-1, ¶ 15. However, the Agreement also states that if Griaznov "terminates this Agreement prior to J.K.'s completion of its work, [Griaznov] agrees to pay J.K. a storage fee of twenty-five dollars ($25.00) per day until the vehicle is removed from J.K.'s custody and control, *together with all other costs and expenses* incurred by J.K." *Id.* (emphasis added).

As indicated, Griaznov does not specify when he cancelled the Agreement. But, J.K.'s uncontradicted evidence establishes that on two occasions plaintiff sought to cancel and then changed his mind. And, when plaintiff actually did terminate the Agreement, it was after virtually all the work had been performed by J.K.

According to Weisheit, between "early July 2013" and June 30, 2015, J.K. was in frequent contact with Karr and Bender about the conversion process, including the need for additional parts, labor, and research. *See* ECF 45-2. ¶¶ 13, 14, 19-20, 22-23, 25-26, 29, 31, 34, 38-39. On August 18, 2014, after J.K. filed and revised the Petition with DOT, and engaged in the DOT comment process (*id.* ¶¶ 23-28), Bender emailed J.K. in an effort to cancel the contract. *Id.* ¶ 29. According to Weisheit, Bender "demanded that J.K. export the Vehicle." *Id.* A copy of the email was not submitted by the parties. However, Weisheit avers that J.K. informed Bender and Karr that before the Vehicle could be exported, J.K. must be paid for work completed and for "the time it would take to re-assemble the Vehicle for exporting." ECF 45-2, ¶ 29. According to Weisheit, Bender and Karr "acknowledged this and instead requested that J.K. continue with the Petition comment process and conversion of the Vehicle." *Id.*

In January 2015, Karr again "reversed course," and told J.K. that Griaznov wanted to "export the Vehicle." ECF 45-2, ¶ 31. According to Weisheit, Karr acknowledged "Griaznov's

contractual obligation to pay for all of the research and development conducted to date, as well as the agency fees and storage." *Id.* However, "[a]fter further consideration," Griaznov "again requested that J.K. continue with the Petition and conversion processes." *Id.*

Then, on May 15, 2015, J.K. sent Karr "a list of the parts sourced by J.K. to complete the conversion." *Id.* ¶ 38. According to Weisheit, Karr "demand[ed] the Vehicle be exported out of the United States without paying J.K. for the services J.K. provided." *Id.* ¶ 39. On June 30, 2015, J.K. sent an invoice to Griaznov (ECF 45-5 at 4-5), indicating he owed J.K. $41,069.87. However, Griaznov refused to pay. ECF 45-2, ¶ 41. As such, the Vehicle "remained in J.K.'s facility." *Id.*

Plaintiff appears to have given notice of termination on May 15, 2015. On that date, Griaznov demanded the export of the Vehicle, and refused to pay J.K. for services it had already rendered. ECF 34, ¶ 39. Pursuant to the Agreement (ECF 55-1), Griaznov was required to give "thirty (30) days of notice" to J.K. before termination of the Agreement. *Id.* ¶ 15. Thus, in the light most favorable to plaintiff, the effective date of termination of the Agreement was thirty days later, on or about June 14, 2015.

As noted, the invoice dated June 30, 2015, was for the total sum of $41,069.87. *See* 45-5 at 4-5. Pursuant to the Agreement, Griaznov is obligated "to pay J.K. a storage fee of twenty-five dollars ($25.00) per day until the vehicle is removed from J.K.'s custody and control, together with all other costs and expenses incurred by J.K." ECF 55-1, ¶ 15. Of the total sum set forth in the invoice, the invoice sought payment for parts, in the amount of $29,919.87; for labor, in the amount of $8,100; and for storage fees from March through June of 2015, totaling $3,050. Therefore, as of June 30, 2015, plaintiff owed $38,019.87 for labor, parts, research, and fees, plus $3,050 in storage charges, for a total of $41,069.87. Accordingly, when Griaznov

terminated the Agreement in June 2015, he was not entitled to recover $16,920.00 from J.K., as he claims. *See* ECF 34, ¶¶ 112, 114. ECF 55-1, ¶ 15; *see* ECF 45-5 at 4-5; ECF 45-2, ¶ 41.

As to Griaznov's claim that J.K. refused to export the Vehicle to Russia upon Griaznov's request, the Agreement "commit[ted] the RI [*i.e.*, J.K.] to conduct the conformance modifications required under the Federal Motor Vehicle Safety Act, and regulations adopted under it, and other safety related acts and regulations." ECF 55-1, ¶ D. Thus, pursuant to the Safety Act, as incorporated into the Agreement (ECF 55-1, ¶¶ F-G), J.K provided a bond to U.S. Customs (ECF 45-2, ¶ 17), and Griaznov agreed to "comply with the terms the Secretary of Transportation decides are appropriate to ensure that the vehicle . . . will comply with applicable motor vehicle safety standards . . . ." 49 U.S.C. § 30141(d)(1)(A); *see* ECF 55-1, ¶ D.

Under the Agreement (ECF 55-1, ¶ G), Griaznov acknowledged that J.K. was required to convert the Vehicle to "comply with applicable motor vehicle safety standards," 49 U.S.C. § 30141(d)(1)(B), and that "until DOT and USEPA's hold periods have expired . . . , J.K. will only release the vehicle into the custody of U.S. Customs." ECF 55-1, ¶¶ 3-4, *id.* ¶ D; *see also* 49 U.S.C. § 30141(d)(1)(B). Thus, pursuant to the Agreement and the Safety Act, J.K. was unable to export the Vehicle to Russia. ECF 34, ¶ 110; *see* 49 U.S.C. § 30141(d)(1)(B).

Moreover, the Agreement did not require J.K. to export or abandon the Vehicle prior to receiving payment from Griaznov. Rather, the Agreement obligates Griaznov to compensate J.K. for "a storage fee of twenty-five dollars ($25.00) per day until the vehicle is removed from J.K.'s custody and control, *together with all other costs and expenses incurred by J.K*." ECF 55-1, ¶ 15 (emphasis added). And, if Griaznov fails to pay J.K., the Agreement authorizes J.K. to place "a mechanics lien on the vehicle for work completed." *Id.* ¶ 11.

To be sure, the Agreement also states, *id.* ¶ 3: "If DOT rejects the petition, or [Griaznov] decides it is too expensive to continue, and has the RI rescind the petition [from DOT], the vehicle must be exported or destroyed." However, no request was submitted to rescind the Petition. Moreover, this provision cannot be read in a vacuum. Under the Agreement, Griaznov is required to pay J.K. "all . . . costs and expenses incurred by J.K," plus storage fees, prior to "the vehicle [being] removed from J.K.'s custody and control." *Id.* ¶ 15. Griaznov has failed to make any such payment.

Accordingly, Griaznov has failed to show that J.K.'s refusal to export the Vehicle to Russia constitutes a breach of the Agreement.

Griaznov also claims that the Agreement was breached because he never approved the parts and labor necessary to convert the Vehicle. This claim is unsupported by any evidence. Indeed, the evidence is to the contrary.

Under the Agreement, J.K. was not required to obtain consent from Griaznov before purchasing parts or performing labor. *See* ECF 55-1. Rather, the Agreement required J.K. to complete the conversion according to the requirements of the Safety Act. *See id.* ¶ D. The Agreement stated, *id.* ¶ 14: "If the vehicle imported by Importer is not on the DOT Eligibility List" (and the Vehicle here was not (ECF 45-2, ¶ 13)), Griaznov "agrees to pay J.K. to place the vehicle on the Eligibility [List] as well as a daily storage fee of twenty five dollars ($25.00) per day, until the vehicle is placed on the Eligibility List." ECF 55-1, ¶ 14. Further, Griaznov agreed that he would be "invoice[d] for [J.K.'s] services" (*Id.* ¶ 5) and that J.K.'s "work shall be deemed to be completed on the date DOT and USEPA hold periods have expired . . . ." *Id.* ¶ 3.

**4.**

J.K. avers that Griaznov breached the Agreement by failing to compensate J.K. for labor, research, parts, and storage costs associated with the conversion process. ECF 45-1 at 19. In the Motion, J.K. seeks $177,412.82 from Griaznov, plus attorneys' fees and costs. ECF 45-2, ¶ 52; ECF 45-1 at 19. This far exceeds the sum of $41,069.87 that J.K. claimed Griaznov owed in June 2015, after notice of termination was effective. *See* ECF 45, ¶ 2; ECF 45-5 at 4-5; ECF 45-2, ¶ 41.

According to J.K., it was "obligated by the EPA and DOT rules and regulations, the bond, and the terms of the [Agreement to] complete[] the conversion of the Vehicle," despite Griaznov's failure to pay. ECF 45-2, ¶ 42. Accordingly, J.K. seeks compensatory damages for fees and costs incurred by J.K. before *and* after Griaznov breached the Agreement in June 2015. *Id.* ¶¶ 41-42.

It is undisputed that Griaznov refused to pay the invoice of June 30, 2015, in the amount of $41,069.87, which covered parts, labor, and the storage fees as of that date. *See* ECF 45-5 at 4-5; ECF 45-2, ¶ 41. The Agreement required Griaznov to pay J.K. for parts, labor, the storage fees, and other costs related to the conversion process. *See* ECF 55-1, ¶¶ 9-11, 14, 15. By failing to pay J.K., Griaznov breached the Agreement.

Generally, "[a] party asserting a claim of breach of contract has a duty to mitigate damages and may not recover for additional costs incurred absent ordinary efforts and reasonable expenditure to minimize consequential damages." *Middle East Broadcasting Networks, Inc. v. MBI Global, LLC*, 689 F. App'x 155, 162 (4th Cir. 2017) (citation omitted; quotation marks omitted); *see Barrie School v. Patch*, 401 Md. 497, 512, 933 A.2d 382, 391 (2017) ("We have recognized generally that, when one party breaches a contract, the other party

is required by the 'avoidable consequences' rule of damages to make all reasonable efforts to minimize the loss sustained from the breach and can charge the defending party only with such damages as, 'with reasonable endeavors and expense and without risk of additional substantial loss or injury, he could not prevent.'") (quoting *Circuit City v. Rockville Pike,* 376 Md. 331, 355, 829 A.2d 976, 990 (2003)).  Failure to mitigate damages is an affirmative defense.  *See Middle East Broadcasting Networks, Inc.*, 689 F. App'x at 162.  And, Griaznov has not shown that J.K. failed to mitigate its losses.

Moreover, J.K. avers that it was required by the Safety Act, the bond, and the Agreement to complete the conversion process, despite Griaznov's failure to pay.  *See* ECF 55-2, ¶ 42.  Further, the Agreement states that Griaznov is liable to J.K. for "*all* other costs and expenses incurred by J.K," not merely costs and expenses incurred prior to the termination of the Agreement.  ECF 55-1, ¶ 15 (emphasis added).

When Griaznov breached the Agreement in June 2015, he became obligated "to pay J.K. a storage fee of twenty-five dollars ($25.00) per day . . . ."  *Id.*  Because the Vehicle remained at J.K.'s facility, a daily storage fee continued to be assessed.  However, under the parties' Status Quo Letter of November 3, 2016 (ECF 19-2), the parties agreed "to maintain the *status quo*" in order "to reduce the costs" of the litigation.  *Id.*  Therefore, J.K. is not entitled to recover storage fees as of November 3, 2016.

I also note that J.K. now seeks storage fees as of July 25, 2013, even though the Agreement was in effect through June 30, 2015.  Notably, these storage fees were not included in the invoice of June 30, 2015.  *See* ECF 45-5 at 4-5.  This confirms that storage fees were not to be charged while the Agreement was in effect.  In my view, the request is inconsistent with the terms of the Agreement, and essentially amounts to double dipping.

I conclude that J.K. is entitled to storage fees from July 1, 2015 (the effective date of the termination of the Agreement) through the date of the Status Quo Letter, *i.e.*, November 3, 2016. By my calculations, this amounts to 490 days, at $25 per day, for a total of $12,250. With credit for plaintiff's deposit, plaintiff owes defendant the sum of $131,012.82.[12]

**5.**

The Agreement states: "If J.K. employs attorneys to enforce any rights arising out of or relating to this Agreement, and J.K. prevails in any action brought by its attorneys, [Griaznov] shall pay J.K.'s reasonable attorneys' fees, costs and other expenses." ECF 55-1, ¶ 18. Although J.K. seeks attorneys' fees and costs associated with this litigation (ECF 7; ECF 45), it has failed to document its fees and costs.

Ordinarily, in calculating the appropriate award of attorneys' fees, the court first determines the lodestar amount, defined as a "reasonable hourly rate multiplied by hours reasonably expended." *Grissom v. The Mills Corp.*, 549 F.3d 313, 320 (4th Cir. 2008); *see Robinson v. Equifax Info. Servs., LLC*, 560 F.3d 235, 243 (4th Cir. 2009); *Plyler v. Evatt*, 902 F.2d 273, 277 (4th Cir. 1990) (stating that, "[i]n addition to the attorney's own affidavits, the fee applicant must produce satisfactory specific evidence of the prevailing market rates in the relevant community for the type of work for which he seeks an award") (citations and internal quotation marks omitted). "The Supreme Court has indulged a 'strong presumption'" that the "lodestar" figure, as defined by the Court in *Hensley v. Eckerhart*, 461 U.S. 424, 434

---

[12] I note that in ¶ 51 of ECF 45-2, Weisheit notes that plaintiff paid $20,500 on October 9, 2013. But, in ¶ 52, in which Weisheit sets out the basis for J.K.'s claim of $177,412.82, he does not set forth that the deposit paid by plaintiff was deducted from the balance owed to defendant. *But see* ECF 45-5 at 2. In the context of the Motion, the burden of proof is on defendant. Accordingly, I cannot conclude that plaintiff received the credit.

(1983), "represents a reasonable attorney's fee." *McAfee v. Boczar*, 738 F.3d 81, 88-89 (4th Cir. 2013).

The court determines a reasonable fee by assessing whether the hours worked were reasonable or whether the request includes hours that were unnecessary or duplicative. Thus, J.K. "must show that the number of hours for which [it] seeks reimbursement is reasonable and does not include hours that are excessive, redundant, or otherwise unnecessary." *Travis v. Prime Lending*, No. 3:07cv00065, 2008 WL 2397330, at *4 (W.D. Va. June 12, 2008) (concluding, after initially determining that the attorney's hourly rate was reasonable, that attorney's fees requested by plaintiff were reasonable, based on documentation of hours worked and the work completed); *Flynn v. Jocanz*, 480 F. Supp. 2d 218, 220-21 (D.D.C. 2007) (awarding requested attorney's fees based on affidavits and the record).

Appendix B to this Court's Local Rules sets out guidelines for determining attorneys' fees in certain cases. Among other things, it sets out mandatory rules regarding billing format and time recordation, and submission of quarterly statements to the opponent. Appendix B, 1. It also outlines non-compensable time. *Id.*, 2. It also sets guidelines for hourly rates for attorneys, based on years at the bar. *Id.*, 3.

In evaluating the reasonableness of the requested legal fee, the court also considers the twelve factors articulated in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974), and adopted by the Fourth Circuit in *Barber v. Kimbrell's, Inc.*, 577 F.2d 216, 226 (4th Cir. 1978); *see McAfee*, 738 F.3d at 88-89. The *Johnson* factors follow, 488 F.2d at 717-19:

(1) the time and labor required;
(2) the novelty and difficulty of the questions;
(3) the skill requisite to properly perform the legal service;
(4) the preclusion of other employment by the attorney due to acceptance of the case;

(5) the customary fee;

(6) whether the fee is fixed or contingent;

(7) time limitations imposed by the client or the circumstances;

(8) the amount involved and the results obtained;

(9) the experience, reputation, and ability of the attorneys;

(10) the "undesirability" of the case;

(11) the nature and length of the professional relationship with the client; and

(12) awards in similar cases.

A trial court is vested with discretion in determining the award of fees, because of its "'superior understanding of the litigation.'" *Thompson v. HUD*, No. MJG-95-309, 2002 WL 31777631, at *6 n.18 (D. Md. Nov. 21, 2002) (quoting *Daly v. Hill*, 790 F.2d 1071, 1078-79 (4th Cir. 1986)); *see also McAfee*, 738 F.3d at 88; *Robinson*, 560 F.3d at 243.

J.K. has not provided any basis for an award of legal fees. Consequently, I cannot award attorneys' fees at this juncture in connection with the breach of contract claim.

### C. The Maryland Consumer Protection Act

In the Amended Complaint, Griaznov avers that J.K. engaged in "unfair and deceptive trade practice" under C.L. § 13-301, by failing to provide Griaznov with estimates he requested as to "the cost and labor associated with the conversion." ECF 34, ¶¶ 124, 128. Griaznov argues that he relied on the initial estimate for the conversion of the Vehicle, which was for approximately $18,000.00. *Id.* ¶ 127.[13] However, J.K. has provided unrefuted, substantial evidence to the contrary.

---

[13] In ECF 34, ¶ 126, plaintiff also claims a violation of C.L. § 14-1002(b), which provides that an automotive repair facility may not charge a customer an amount that exceeds 10% of a written estimate, unless the customer provides written consent.

Arguably, the Agreement is written consent. In any event, J.K. claims, without contradiction, that it is not an automotive repair facility. ECF 45-2, ¶ 8.

The Maryland CPA authorizes the plaintiff to "recover for injury or loss sustained by him as the result" of an unfair or deceptive trade practice. C.L. § 13–408(a). Under the CPA, "unfair or deceptive trade practices" are defined, *inter alia,* as "[f]alse, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers[.]" C.L. § 13-301(1).

To bring an action under the CPA, a plaintiff must allege "(1) an unfair or deceptive practice or misrepresentation that (2) is relied upon, and (3) causes [him] actual injury." *Stewart v. Bierman,* 859 F. Supp. 2d 754, 768 (D. Md. 2012), *aff'd sub nom. Lembach v. Bierman,* 528 F. App'x 297 (4th Cir. 2013) (citing *Lloyd v. Gen. Motors Corp.,* 397 Md. 108, 140, 916 A.2d 257, 277 (2007)). Of particular relevance here, the CPA requires an "actual injury." *Id.* In *Citaramanis v. Hallowell,* 328 Md. 142, 151, 613 A.2d 964, 968 (1992), the Maryland Court of Appeals emphasized that, because the CPA's private right of action is limited to recovery of "injury or loss sustained," a plaintiff "pursuing a private action under the CPA [must] prove actual 'injury or loss sustained' "in order to prevail. *Citaramanis,* 328 Md. at 151, 613 A.2d at 968; *accord McDaniel v. Baranowski,* 419 Md. 560, 587–88, 19 A .3d 927, 943 (2011).

J.K. points to the Quote (ECF 45-3), which states that the initial "$12,000.00-$18,000.00" estimate was subject to additional costs for "**safety systems parts that are not in compliance with USDOT Standards," and/or "additional emissions systems parts and testing** . . . ." *Id.* at 1 (bold in original). Indeed, Griaznov was forewarned that "[i]f the car is not equipped correctly . . . , AND/OR is not on the DOT eligibility list . . . , there could be additional charges." ECF 45-3 at 2. Further, Griaznov was told, *id.* at 3: "If the car is not emissions equipped . . . there will be substantial extra charges[.]" And, Griaznov was warned

that he would have to make a "final payment" consisting of "the balance . . . due upon receipt of parts for the vehicle . . . ." *Id.*

Additionally, the Agreement notified Griaznov that the $18,000.00 estimate was subject to "**any emissions system parts, safety system parts, labor, research and development, and any testing necessary to bring the vehicle into conformity with USEPA and DOT specification** . . . ." ECF 55-1, ¶ 7 (bold in original). And, the Agreement stated that the $18,000.00 "estimate [was J.K.'s] best guess without seeing the vehicle and may be updated . . . ." *Id.* ¶ 7. Of import, the Agreement stated that Griaznov "understands that all estimates are based specifically on the representations of the owner," *i.e.*, Griaznov. *Id.* ¶ 8.

Further, the Agreement advised Griaznov that defendant "recommends checking with the manufacturer directly before making any assumptions regarding required components." *Id.* And, Griaznov was notified that, "[i]f the vehicle arrives at J.K. . . . declared incorrectly, is not on the DOT eligibility list . . . , or does not have a functioning emissions system based on the Importer's representations, there may be extra charges. . . ." *Id.*

As noted, the Vehicle was not on the Eligibility List. ECF 45-2, ¶ 13. Additional parts, labor, research, and storage were required to convert the Vehicle. *Id.* ¶¶ 14-47. And, J.K. was in frequent contact with plaintiff's representatives, Karr and Bender, about those costs. *Id.* ¶¶ 13, 14, 19-20, 22-23, 25-26, 29, 31, 34, 38-39. Moreover, Griaznov was forewarned about such costs.

In my view, there is no basis for a claim under the CPA.

### D. Replevin, Trespass to Chattels, and Trover And Conversion

Griaznov asserts claims of replevin, trespass to chattels, as well as trover and conversion. *See* ECF 34. "[U]nder Maryland law, replevin allows '[a] person claiming the right to

-44-

immediate possession of personal property [to] file an action for possession before judgment.'" *IFAST, Ltd. v. All. for Telecommunications Indus. Sols., Inc.*, CCB-06-2088, 2007 WL 3224582, at *10 (D. Md. Sept. 27, 2007) (quoting 1 M.L.E. Actions § 30 (2006)) (alterations in *IFAST, Ltd.*); *see also Dehn Motor Sales, LLC v. Schultz*, 439 Md. 460, 486, 96 A.3d 221, 237 (2014) ("In a replevin action, a party seeks basically to recover specific goods and chattels to which he or she asserts an entitlement to possession."); *Furda v. State*, 193 Md. App. 371, 398 n.17; 997 A.2d 856, 872 n.17 (2010) ("Replevin is appropriate 'in all cases where the object of the suit is to recover possession of specific goods and chattels, to the possession of which the plaintiff claims to be entitled at the time of instituting the suit.'") (citation omitted). "'[W]hoever is entitled to possession, whatever may be his title in other respects, may maintain or defeat the action of replevin; his right to success in the action of replevin depends entirely on his right to possession.'" *Dehn Motor Sales*, 439 Md. at 486; 96 A3d at 237 (quoting *Shorter v. Dail*, 122 Md. 101, 89 A. 329, 330 (1913)) (alteration in *Dehn Motor Sales*).

Notably, C.L. § 16-208 provides "a vehicle owner the opportunity to file a replevin action[] to secure the return of his car from the retaining garageman, prior to sale." *Stansbury*, 445 Md. at 207, 126 A.3d at 52. It states, in part, C.L. § 16-208(a): "If the owner of property subject to a lien institutes an action of replevin and establishes a right to the issuance of a writ but for the defendant's alleged lien under this subtitle, the court shall issue the writ."

In Maryland, trespass to chattel "has been defined as an intentional use or intermeddling with the chattel in possession of another . . . , such intermeddling occurring . . . when 'the chattel is impaired as to its condition, quality, or value.'" *United States v. Arora,* 860 F. Supp. 1091, 1097 (D. Md. 1994) (quoting Restatement (Second) of Torts, §§ 217(b), 218(b)), *aff'd*, 56 F.3d

62 (4th Cir. 1995); *accord Ground Zero Museum Workshop v. Wilson*, 813 F. Supp. 2d 678, 697 (D. Md. 2011).

Conversion is defined as "'an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel.'" *Arora*, 860 F. Supp. at 1097 (quoting RESTATEMENT (SECOND) OF TORTS, § 222A(1)) (alteration in *Arora*). To state a claim for trespass to chattel or conversion, a plaintiff must be entitled to rightful possession. *See, e.g.*, *America Online, Inc. v. IMS*, 24 F. Supp. 2d 548, 550 (E.D. Va. 1998) ("A trespass to chattels occurs when one party intentionally uses or intermeddles with personal property in rightful possession of another without authorization.") (citing RESTATEMENT (SECOND) OF TORTS § 217(b)); *First Union Nat. Bank v. N.Y. Life Ins. & Annuity Corp.*, 152 F. Supp. 2d 850, 854 (D. Md. 2001) ("In order to recover for conversion, 'one must have either been in actual possession or have had the right to immediate possession in the converted asset.'") (citation omitted).

Trover is the traditional common law action from which the tort of conversion arose. *See Lawson v. Comm. Land Title Ins. Co.*, 69 Md. App. 476, 480, 518 A.2d 174, 175-76; *see also Iglesias v. United States*, 848 F.2d 362, 364 (2d Cir. 1988) ("The modern law of conversion is derived from the common law action of trover . . . ."). Accordingly, I shall refer only to conversion.

As discussed, J.K. expended substantial time and labor to file the Petition, place the Vehicle on the Eligibility List, and convert the Vehicle. In June 2015, Griaznov refused to pay J.K. for its efforts. ECF 45-2, ¶ 41; ECF 45-5 at 4-5. And, according to J.K., as of September 30, 2017, the date the Motion was filed, approximately $177,412.82 was due and owing to J.K.

from Griaznov. ECF 45-2, ¶ 52. J.K. retained possession of the Vehicle in accordance with the Agreement and Maryland law.

Griaznov has provided no basis for the Court to find that he is entitled to rightful possession of the Vehicle. In my view, Griaznov's claims of replevin, trespass to chattel, and conversion are without merit.

### E. Injunctive Relief

Griaznov requests a permanent injunction prohibiting J.K. from "using, altering, damaging, destroying, or selling the Vehicle," and a mandatory injunction requiring J.K. to "restore the Vehicle to its original condition . . . ." ECF 34 at 7-8.

Typically, "'[a] request for injunctive relief does not constitute an independent cause of action; rather, the injunction is merely the remedy sought for the legal wrongs alleged in . . . the substantive counts.'" *Simone v. VSL Pharm., Inc.*, TDC-15-1356, 2017 WL 66323, at *10 (D. Md. Jan. 5, 2017) (quoting *Fare Deals Ltd. v. World Choice Travel.com, Inc.*, 180 F. Supp. 2d 678, 682 n.1 (D. Md. 2001)) (alteration in *Simone* omitted); *see also Orteck Int'l, Inc. v. Transpacific Tire Wheel, Inc.*, 704 F. Supp. 2d 499, 521 (D. Md. 2010), *aff'd.*, 457 F. App'x 256 (4th Cir. 2011) ("An injunction and an accounting are remedies, not independent causes of action.").

Nevertheless, the fact that a plaintiff pleads injunctive relief as an independent claim does not automatically mandate dismissal. In *Dwoskin v. Bank of America, N.A.*, 850 F. Supp. 2d 557, 573 (D. Md. 2012), in which the plaintiffs pleaded injunctive relief as a count in their complaint, Judge Blake determined that dismissal of that count was not necessary because "the [plaintiffs] ha[d] adequately pled five causes of action in th[e] case, leaving them causes of action on which they [could] seek the requested injunction." *See also M.J. Woods, Inc. v. Little Rapids Corp.*,

MOC-DLH-16-356, 2016 WL 7494469, at *4 (W.D.N.C. Dec. 30, 2016) (dismissing a count for injunction, but incorporating it "by reference elsewhere without further amendment").

However, courts have found dismissal of independent claims for injunctive relief appropriate in some instances. For example, in *Simone*, 2017 WL 66323, Judge Chuang dismissed counts of a complaint seeking a preliminary and permanent injunction. He reasoned that "[w]here . . . injunctive relief is included in the request for relief, there is no reason to allow these duplicative requests to proceed in the improper guise of independent causes of action." *Id.* at *10.

A permanent injunction is an injunction that is granted after a final hearing. *See Permanent Injunction*, BLACKS LAW DICT. (10th Ed.). A mandatory injunction is a court order compelling a party to act. *See Moor v. Texas & N.O.R. Co.*, 297 U.S. 101, 103 (1936). As to a permanent injunction, the Supreme Court has said, *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006): "According to well-established principles of equity, a plaintiff . . . must demonstrate: (1) that [he] has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."

As explained, the underlying claims of Griaznov's Amended Complaint are without merit. Accordingly, there is no basis to award him injunctive relief. *See Simone*, 2017 WL 66323, at *10.

## V. Conclusion

For the foregoing reasons, I shall grant the Motion in part and deny it in part. An Order follows.

Date:   September 11, 2018             _____/s/_____
                                       Ellen Lipton Hollander
                                       United States District Judge